IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 18, 2018 Session

## STATE OF TENNESSEE v. CODY DARAND MARKS

**Appeal from the Circuit Court for Giles County**
**No. CR-12948       Russell Parkes, Judge**

_____

### No. M2018-00020-CCA-R3-CD

_____

Defendant, Cody Darand Marks,[1] was convicted of one count of .5 grams or more of cocaine within 1000 feet of a school zone and was sentenced as a Range II offender to fifteen years of incarceration with mandatory minimum service of twelve years at 100%. On appeal, Defendant argues the evidence is insufficient to sustain his conviction because the State failed to prove beyond a reasonable doubt the amount of cocaine that was exchanged within the drug free zone as opposed to the amount that was exchanged earlier at a separate location. Based on his same argument regarding the weight of the cocaine, Defendant additionally argues that the trial court erred by failing to grant his motion for judgment of acquittal, erred by failing to overturn the verdict as thirteenth juror, and erred by failing to provide an enhanced unanimity instruction to the jury. Upon our review of the record and applicable authorities, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and J. ROSS DYER, J., joined.

Robert W. Curtis III, Pulaski, Tennessee, for the appellant, Cody Darand Marks.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Assistant Attorney General; Brent Cooper, District Attorney General; and Jonathan W. Davis, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

---

[1] Defendant's middle name is spelled variously as "Darand," "Duran," and "Durand" in the technical record. The policy of this Court is to use the spelling as set out in the indictment.

*Factual and Procedural Background*

Defendant was indicted by a Giles County grand jury of one count of sale of .5 grams or more of cocaine within 1000 feet of a school zone, specifically Bridgeforth Middle School. The indictment was subsequently amended to allege a sale within 1000 feet of a drug free zone, specifically North End Park.[2] Trial commenced on February 6, 2017, at which the following facts were adduced.

In June of 2015, Joshua Higdon was working as a criminal informant for the Pulaski Police Department. Mr. Higdon testified that he was paid $100 for each controlled drug buy. Mr. Higdon had several prior felony convictions in California and Tennessee, including for possessing and selling drugs. Investigator Gerrod Shirey, a narcotics investigator with the Pulaski Police Department, explained that the police use criminal informants to conduct controlled drug buys because they are more familiar with the situation and because drug dealers are more comfortable selling to people they know. At trial, Mr. Higdon admitted that he was a drug addict and that he was currently incarcerated for violating his felony probation by testing positive for methamphetamine. Mr. Higdon testified that methamphetamine was his "drug of choice" but that he was also using crack cocaine in June of 2015. Mr. Higdon denied using drugs during the transaction at issue. Investigator Kenneth Bass, also a narcotics investigator with the Pulaski Police Department, testified that he is familiar with people under the influence of narcotics, that he will not send out an informant who is intoxicated, and that the case is "messed up" if the informant returns intoxicated. Investigator Bass testified that Mr. Higdon did not appear to be under the influence at the time of this transaction but agreed that Mr. Higdon was "fidgety by nature."

On June 9, 2015, Mr. Higdon contacted Defendant about purchasing two grams of crack cocaine, which was usually priced at $100 per gram. Mr. Higdon testified that he initially asked for one gram but then asked for two because "the officers wanted more." Mr. Higdon met with Investigators Shirey and Bass at an undeveloped subdivision in a secluded area about five or six miles outside of town. Investigator Shirey searched Mr. Higdon and his truck while Investigator Bass provided Mr. Higdon with $200 cash and audio recording equipment. Investigator Shirey testified that he gave Mr. Higdon a thorough pat down, checked his pockets, and then searched anywhere in the cab of the truck where drugs or weapons could be hidden, including inside the glove box. Investigator Shirey did not recall seeing anything in the bed of Mr. Higdon's truck and did not search under the hood. Even though the plan was for Mr. Higdon to meet

---

[2] The State filed its motion to amend the indictment on January 31, 2017. The amended indictment was read into the record after jury selection. The trial court then held a bench conference to place on the record that the parties had discussed the motion to amend in a conference call prior to trial and that the motion to amend had been granted.

Defendant at Mr. Higdon's house, neither of the officers searched Mr. Higdon's house for contraband. Mr. Higdon denied that he kept any drugs at his house other than marijuana.

Mr. Higdon returned to his house and waited for Defendant outside by his truck so that the officers could see him. Investigators Shirey and Bass drove up and down the street in an unmarked police car in order to monitor their informant; however, they could not maintain constant surveillance because of the potential of being recognized as police. Investigator Shirey testified that every time they passed Mr. Higdon's house, he was outside and appeared to be working on his truck. Mr. Higdon testified that when Defendant arrived, they went inside the house briefly because Defendant did not want to be outside to make the exchange. According to Mr. Higdon, Defendant "didn't have all of the - - what I wanted." Mr. Higdon testified that Defendant offered to obtain the rest of the drugs and meet Mr. Higdon at Bad Habits, a convenience store "right around the corner," to complete the transaction. In the audio recording, Defendant can be heard saying that he will go "right down the street and get the other hundred." Mr. Higdon testified, "So I kept half the money, kept half the substance." Mr. Higdon then contacted Investigator Shirey to ask whether he should turn over what he had and the extra buy money or whether he should meet Defendant again to complete the transaction. Mr. Higdon did not meet with the officers prior to heading to Bad Habits. Investigator Shirey admitted that he was not sure how much, if any, of the drugs Mr. Higdon received while inside his house.

After a few minutes, Mr. Higdon drove to Bad Habits, which he estimated was about three blocks from his house. Mr. Higdon testified that it was Defendant's idea to meet at Bad Habits. Investigators Shirey and Bass drove to that area to continue their surveillance while Investigator Ryan Southerland parked at a gas station across the street to record the transaction with a video camera. The video recording shows Defendant walking down the road toward the store and Mr. Higdon sitting in his truck in the parking lot of Bad Habits. Investigator Bass testified that Investigator Southerland would have informed him if anyone else had approached Mr. Higdon's truck prior to the start of the recording. The video shows Defendant getting into the passenger side of Mr. Higdon's truck and engaging in a short conversation. Mr. Higdon testified that Defendant exchanged the remainder of the drugs while inside his truck. Mr. Higdon agreed that he went inside the store at one point, which is not depicted on the video recording, but he denied purchasing drugs from anyone while inside.

Mr. Higdon testified that when he pulled out of the parking lot, he thought he saw Defendant's girlfriend following him in a silver Impala. In the video, a silver car can be seen leaving the parking lot after Mr. Higdon's truck. Because he believed that he was being followed, Mr. Higdon first drove home rather than directly to the designated meeting place. After waiting for a few minutes, Mr. Higdon believed he was still being followed, "[s]o [he] rerouted and [he] got lost." Mr. Higdon explained that at the time, he

had lived in Pulaski for only a few months and was not familiar with the area. Investigator Shirey testified that even though Mr. Higdon had been working as an informant for a while and had participated in five or more drug buys for the police department, this was the first time they had used this particular meeting location. Investigator Shirey agreed that he lost sight of Mr. Higdon for what "seemed like forever" but was actually about fifteen or twenty minutes. Mr. Higdon called Investigator Shirey while he was driving around, relaying various landmarks and directions, and Investigators Shirey and Bass drove around searching for Mr. Higdon. Mr. Higdon agreed that one of the areas he drove through was the Meadowbrook neighborhood, which he characterized as "dope central," but he denied meeting anyone or having drugs stashed somewhere on the side of the road.

When Mr. Higdon finally met up with the officers, he gave them "all the substance" he had purchased from Defendant, which field tested positive for cocaine. The officers searched Mr. Higdon and his truck again. Special Agent Brett Trotter, a forensic scientist with the Tennessee Bureau of Investigation, described the substance as a compressed powder rather than a solid rock, like "sugar [that] had gotten slightly wet." Agent Trotter determined the substance to be 1.25 grams of cocaine base. Using a measuring wheel, Investigator Shirey measured the distance between the location of the drug sale in the parking lot of Bad Habits and a sign designating North End Park across the street as 164 feet. The distance from Mr. Higdon's house to either the park or a nearby daycare center was not measured.[3]

At trial, much was made of whether there was one sale of drugs or two. Mr. Higdon as well as Investigators Shirey and Bass testified about previous experience with drugs deals in which the buyer gives money to the dealer and then waits for the dealer to return with the drugs. Mr. Higdon initially agreed with defense counsel that there were two transactions and two packages of crack cocaine. However, on redirect examination, Mr. Higdon agreed that the original intent in setting up this transaction was to purchase two grams of crack cocaine for $200 and that the transaction was started at his house and completed at Bad Habits. Mr. Higdon testified that if there had been two sales, he would have expected to be paid $100 for each transaction and would have been searched again by the officers before heading to Bad Habits. On recross-examination, Mr. Higdon again agreed with defense counsel that there were two transactions and that money and drugs changed hands two different times. Agent Trotter testified that he received a manila envelope from the Pulaski Police Department containing a single plastic baggie of compressed powder for testing. Investigator Bass testified that he could not say why the

---

[3] In ruling on Defendant's motion for judgment of acquittal, the trial court noted that the indictment specified a sale within 1000 feet of a park and held that any argument with regard to the proximity of Mr. Higdon's house to the daycare center would constitute an impermissible variance.

cocaine was not split into two separate bags and explained that sometimes crack cocaine is not in a bag at all when it is exchanged.

At the close of the State's case in chief, Defendant made a motion for judgment of acquittal on the ground that the jury would not be able to determine whether more than .5 grams of cocaine was sold within the drug free zone. The trial court initially denied the motion until the close of all proof. Defendant chose not to testify or present any proof and renewed his motion for judgment of acquittal. The trial court stated that it "had trouble with a number of questions" regarding the fact that there was "one weight proven of cocaine, and yet having two parts of one transaction or two transactions[.]" The trial court took the motion under advisement and submitted the case to the jury. After each side presented closing argument, the jury returned a verdict of guilty on the charged offense of sale of more than .5 grams of cocaine with 1000 feet of a drug free zone. The trial court stated, "For the purposes of the record, the [c]ourt accepts the verdict as returned by the jury."

At a separate hearing on May 10, 2017, the trial court again considered the motion for judgment of acquittal. Defendant focused his argument on the amount of cocaine exchanged at each location, arguing that "the jury could not have reasonably found beyond a reasonable doubt that [Defendant] passed or exchanged over .5 grams of cocaine at Bad Habits." The trial court noted that "clearly there was proof in the record that the jury believed determined there was a sale of cocaine." However, the trial court was unclear whether Rule 29 of the Tennessee Rules of Criminal Procedure permitted the trial court to grant the motion with regard to the indicted offense and enter a judgment of conviction on the lesser offense of sale of less than .5 grams of cocaine within a drug free zone. The State, citing *Overturf v. State*, 571 S.W.2d 837 (Tenn. 1978), argued that the trial court could not.[4] The trial court found that the evidence was at least sufficient to sustain a conviction for the Class C felony offense of sale of less than .5 grams of cocaine in a drug free zone. While noting its reservations regarding the testimony that only a single amount of cocaine was submitted to the TBI for testing even though there was evidence of cocaine being exchanged at two locations, the trial court ultimately denied the Rule 29 motion for judgment of acquittal with regard to the Class B felony offense of sale of more than .5 grams of cocaine in a drug free zone with which Defendant was convicted. After a sentencing hearing, Defendant was sentenced as a Range II offender to fifteen years with a mandatory minimum service of twelve years at 100%.

---

[4] *Overturf* held that it was a violation of the constitutional protection against double jeopardy for a trial court to direct a verdict of acquittal due to insufficient evidence and then grant a new trial on that same offense. 571 S.W.2d at 839. However, our supreme court has held that "[a] judgment of acquittal is not an all or nothing proposition. A court may grant a judgment of acquittal as to the higher charge and proceed on a lesser-included offense." *Finch v. State*, 226 S.W.3d 307, 318 (Tenn. 2007).

On December 6, 2017, the trial court held a hearing on Defendant's "Motion for Judgment of Acquittal and/or Motion for New Trial." The trial court noted its previous concerns "about the two stages of what [the prosecutor] convinced the [c]ourt was one continuous transaction completed within 1,000 feet of North End Park." The trial court stated that it "first accepted [the verdict] as the 13th juror and approved the same subject to the hearing on the new motion for judgment of acquittal at the close of all of the proof." The trial court again denied Defendant's Rule 29 motion for judgment of acquittal and noted that the jury was able to "deliberate[] on the issue of the completion of the transaction and/or what portion of the transaction occurred within 1,000 feet" of the drug free zone. The trial court ruled that there "was sufficient proof produced at trial to justify the verdict of the jury in this case. So the [D]efendant's motion for new trial would be denied." Defendant filed a timely notice of appeal.

*Analysis*

On appeal, Defendant argues that the evidence is insufficient to sustain his conviction for sale of .5 grams or more of cocaine within 1000 of a drug free zone because the State failed to prove the amount of cocaine that was actually sold at Bad Habits, which was within 1000 feet of the park, rather than at Mr. Higdon's house, from which the distance to the park was not measured. Defendant also argues that the trial court erred by failing to grant his motion for judgment of acquittal pursuant to Tennessee Rule of Criminal Procedure 29 and by "failing to overturn the verdict while acting as thirteenth juror" pursuant to Tennessee Rule of Criminal Procedure 33. Finally, Defendant argues that he was entitled to an enhanced unanimity instruction "to ensure that the jury understood its duty to agree on a particular set of facts." We shall address each issue in turn.

*I. Sufficiency of the Evidence*

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The prosecution is entitled to the "'strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Questions concerning the "'credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact.'" *State v. Wagner*, 382 S.W.3d

289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). "'A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory.'" *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Id.* The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

In this case, Defendant was convicted of sale of .5 grams or more of cocaine within 1000 feet of a drug free zone. *See* T.C.A. §§ 39-17-417(a)(3), (c)(1); 39-17-432(b). Tennessee Code Annotated section 39-17-417(a)(3) provides that "[i]t is an offense for a defendant to knowingly . . . sell a controlled substance[.]" Cocaine is a Schedule II controlled substance. T.C.A. § 39-17-408. A person acts knowingly "with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." T.C.A. § 39-11-302(b). "[A] sale consists of two components: a bargained-for offer and acceptance, and an actual or constructive transfer or delivery of the subject matter property." *State v. Holston*, 94 S.W.3d 507, 510 (Tenn. Crim. App. 2002). "One who accepts payment in exchange for property is involved in a sale." *Id.* at 510-11. When the amount of cocaine sold is .5 grams or more, the offense is a Class B felony. T.C.A. § 39-17-417(c)(1). Under the Drug Free School Zone Act, when the offense occurs within 1000 feet "of the real property that comprises a . . . preschool, child care agency, or public library, recreational center or park," the defendant "shall be punished one (1) classification higher" but "shall not be subject to additional incarceration." T.C.A. § 39-17-432(b)(1), (3). The defendant "shall be required to serve at least the minimum sentence for the defendant's appropriate range." T.C.A. § 39-17-432(c).

This Court has made clear that the Drug Free School Zone Act does not create a separate criminal offense but "merely imposes a harsher penalty for violations of Tenn[essee] Code Ann[otated section] 39-17-417 occurring within a [drug free] zone." *State v. Smith*, 48 S.W.3d 159, 168 (Tenn. Crim. App. 2000); *see* T.C.A. § 39-17-432(b). Therefore, "proof that the drug crime was committed in a [drug free] zone is not an essential element of the 39-17-417 offense." *State v. Arturo Jaimes-Garcia*, No. M2009-00891-CCA-R3-CD, 2010 WL 5343286, at *18 (Tenn. Crim. App. Dec. 22, 2010), *perm. app. denied* (Tenn. May 31, 2011). Thus, for a person charged with selling a controlled substance, the enhanced penalty is triggered if the jury determines beyond a reasonable doubt that any part of the sale occurred in a drug free zone. *See State v. Timothy Allen Johnson*, No. M2015-01160-CCA-R3-CD, 2016 WL 3435589, at *4 (Tenn. Crim. App. June 15, 2016) (holding evidence sufficient to support conviction for sale within a school zone when location where money was exchanged was within the school zone even

though drugs were exchanged after defendant and undercover officer left that location), *perm. app. denied* (Tenn. Oct. 19, 2016); *cf. Arturo Jaimes-Garcia*, 2010 WL 5343286, at *13 (rejecting defendant's contention that conviction for conspiracy to sell 300 grams or more of cocaine in a drug free school zone required proof of an agreement to sell within a school zone and holding that enhanced penalty was triggered when defendant's overt act in furtherance of the conspiracy took him within 1000 feet of a school).

The evidence presented in this case, in the light most favorable to the State, shows that Defendant entered into an agreement with Mr. Higdon to sell two grams of crack cocaine for $200. Defendant initially met with Mr. Higdon at Mr. Higdon's house but did not have the full amount of the drugs promised. Mr. Higdon gave Defendant "half the money," and Defendant gave Mr. Higdon "half the substance." Defendant suggested that they meet at Bad Habits to complete the agreed-upon sale. The exact location where Defendant and Mr. Higdon exchanged the remainder of the drugs and money in the parking lot of Bad Habits was 164 feet away from North End Park. Even though Mr. Higdon did not specify exactly how much cocaine he received at his house and how much he received at Bad Habits, a single plastic baggie containing 1.25 grams of cocaine was submitted to the TBI. We agree with the State that "the [D]efendant's two meetings with the informant, occurring about 20 minutes apart and both of which were required to complete the agreed-upon contract, constituted a single transaction."[5] Under these facts, a jury could reasonably determine that Defendant sold .5 grams or more of cocaine and that at least a portion of the sale occurred within a drug free zone. *See Timothy Allen Johnson*, No. M2015-01160-CCA-R3-CD, 2016 WL 3435589, at *4.

However, even if we were to agree with Defendant's assessment that the evidence showed two separate sales because there were two separate exchanges of drugs and money, the evidence would still be sufficient to sustain his conviction for sale of .5 grams or more of cocaine within a drug free zone for the exchange that occurred at Bad Habits. Mr. Higdon testified that he "kept half the substance" after the initial exchange at his house. By its verdict, the jury accredited this testimony and resolved any conflicts with it. *See Reid*, 91 S.W.3d at 277. Because the total amount of cocaine submitted to the TBI was 1.25 grams, a rational juror could infer that the amount that was exchanged at Bad Habits was the other "half" of the substance, or .625 grams. Because a rational juror could determine that the amount of cocaine exchanged within the drug free zone was more than .5 grams, the evidence is sufficient to sustain Defendant's conviction.

## II. *Motion for Judgment of Acquittal*

---

[5] On appeal, the State primarily relies upon double jeopardy principles regarding multiplicity of convictions to establish that this was a single sale of cocaine. *See State v. Phillips*, 924 S.W.2d 622, 665 (Tenn. 1996); *State v. Epps*, 989 S.W.2d 742, 745 (Tenn. Crim. App. 1998). However, we need not determine whether the State would have been prevented from charging Defendant with two separate sales under the facts of this case.

- 8 -

Tennessee Rule of Criminal Procedure 29 allows the trial court to "order the entry of judgment of acquittal of one or more offenses charged in the indictment . . . after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses." Tenn. R. Crim. P. 29(b). As it did in this case, the trial court may reserve ruling on a motion for judgment of acquittal made after the close of all evidence, submit the case to the jury, and decide the motion after the jury has returned a guilty verdict. Tenn. R. Crim. P. 29(d)(2). "At the point the motion is made, the trial court must favor the opponent of the motion with the strongest legitimate view of the evidence, including all reasonable inferences, and discard any countervailing evidence." *State v. James*, 315 S.W.3d 440, 455 (Tenn. 2010). In other words, the standard by which the trial court determines a motion for judgment of acquittal is identical to the standard which applies on appeal in determining the sufficiency of the evidence after a conviction. *Id.* Because we have determined that the evidence is sufficient to sustain Defendant's conviction for sale of .5 grams or more of cocaine within 1000 feet of a drug free zone, the trial court did not err in denying Defendant's Rule 29 motion for judgment of acquittal.

### III. Thirteenth Juror

Tennessee Rule of Criminal Procedure 33(d) provides that "[t]he trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." This rule "'imposes upon a trial court judge the mandatory duty to serve as the thirteenth juror in every criminal case,'" and makes "'approval by the trial judge of the jury's verdict as the thirteenth juror . . . a necessary prerequisite to imposition of a valid judgment.'" *State v. Biggs*, 218 S.W.3d 643, 653 (Tenn. Crim. App. 2006) (quoting *State v. Carter*, 896 S.W.2d 119, 122 (Tenn. 1995)). "'[T]he trial court must weigh the evidence and grant a new trial if the evidence preponderates against the weight of the verdict.'" *Id*. (quoting *State v. Blanton*, 926 S.W.2d 953, 958 (Tenn. Crim. App. 1996)).

The difference between Rule 29 and Rule 33 is that the former is concerned with the sufficiency of the evidence and the latter with the weight of the evidence. Our supreme court has explained the difference as follows:

> "In evaluating the legal sufficiency of the evidence, the judge determines whether all the necessary elements of the offense have been made out, whether the defendant's identity has been established and whether the proof demonstrates the existence of a valid defense. In doing so, the court is required to view the evidence in the light most favorable to the verdict, giving the prosecution the benefit of all inferences reasonably to be drawn from the evidence. . . .

An inquiry into the weight of the evidence is entirely different. The trial judge does not have to view the evidence in the light most favorable to the prosecution; he may weigh the evidence himself as if he were a juror and determine for himself the credibility of the witnesses and the preponderance of the evidence."

*State v. Ellis*, 453 S.W.3d 889, 899 (Tenn. 2015) (quoting *State v. Johnson*, 692 S.W.2d 412, 415 (Tenn. 1985) (Drowota, J., dissenting)). Because "[a]ppellate courts are ill-suited . . . to assess whether the verdict is supported by the weight and credibility of the evidence . . . , the accuracy of a trial court's thirteenth juror determination is not a subject of appellate review." *State v. Moats*, 906 S.W.2d 431, 435 (Tenn. 1995). Although the duty is mandatory, the trial court is not required to make an explicit statement on the record that has fulfilled its duty to act as thirteenth juror, and appellate courts may presume that the trial court has approved the verdict when it overrules a motion for new trial without comment. *Biggs*, 218 S.W.3d at 653 (citing *Carter*, 896 S.W.2d at 122; *State v. Brown*, 53 S.W.3d 264, 274 (Tenn. Crim. App. 2000)). "[O]nly when the record contains statements indicating that the trial court failed to act as the thirteenth juror or misconstrued its authority under that rule" may an appellate court grant a new trial. *Moats*, 906 S.W.2d at 435.

While the trial court initially expressed some reservations regarding the State's theory that this was a single transaction that occurred at two separate locations, the trial court ultimately approved the verdict both at trial immediately after the jury returned its verdict and again at the hearing on the motion for new trial. Therefore, the trial court fulfilled its duty as thirteenth juror, and Defendant is not entitled to relief.

### IV. Enhanced Unanimity Instruction

Again relying on his contention that the evidence established that there were two separate sales of cocaine, Defendant argues that the trial court erred by failing to give the jury an enhanced unanimity instruction. Defendant acknowledged at the motion for new trial hearing that he did not specifically request such an instruction at trial. However, this Court has held that "a defendant has a fundamental constitutional right to a unanimous verdict, and is therefore entitled to an election and an unanimity instruction even when he has not requested them." *State v. Charles A. Walker*, No. M2005-00165-CCA-R3-CD, 2006 WL 3313651, at *14 (Tenn. Crim. App. Nov. 15, 2006) (citing *Burlison v. State*, 501 S.W.2d 801, 804 (Tenn. 1973)), *perm. app. denied* (Tenn. Mar. 12, 2007). Therefore, the issue is not waived.

We begin our analysis by noting that even though Defendant does not specifically argue that the State should have made an election of offenses, the case law involving

election of offenses and unanimity instructions often intertwine because both involve the constitutional right to a unanimous jury verdict. *See Tidwell v. State*, 922 S.W.2d 497, 501 (Tenn. 1996) ("A defendant's right to a unanimous verdict before imposition of conviction requires the trial court to take precautions to ensure that the jury deliberates over the particular charged offense, instead of assembling a 'patchwork verdict' based on the different offenses in evidence."). Both an election of offenses and an enhanced or modified unanimity instruction "safeguard[] the defendant's state constitutional right to a unanimous jury verdict by ensuring that jurors deliberate and render a verdict based on the same evidence." *State v. Johnson*, 53 S.W.3d 628, 631 (Tenn. 2001). These requirements "ha[ve] been applied almost exclusively in the sex crimes context, and specifically, when the defendant is alleged to have committed a series of sexual acts over a lengthy period of time against young children who are unable to identify the exact date on which any one act was perpetrated." *Id.* (citing cases). The general rule is that if the State offers proof of multiple offenses in support of a single charged offense, it must elect the facts upon which it is relying to establish the charged offense. *Id.* "When the evidence does not establish that multiple offenses have been committed, however, the need to make an election never arises." *State v. Adams*, 24 S.W.3d 289, 294 (Tenn. 2000). In other words, the concern over whether the jury has rendered a unanimous verdict only arises when the State has introduced evidence of "multiple discrete acts that individually constitute separate substantive offenses." *Id*.

Defendant relies heavily upon this Court's opinion in *State v. Brown*, 823 S.W.2d 576 (Tenn. Crim. App. 1991), to support his contention that the trial court should have given an enhanced unanimity instruction. In *Brown*, the defendant was charged with possession with intent to sell cocaine for cocaine found at two separate, but adjoining properties. *Id*. at 578. The *Brown* court held that the State was not required to make an election of offenses because "the evidence of simultaneous possession indicate[d] that the defendant was confronted with only one offense." *Id*. at 581. However, the court held that "the fact that the election remedy does not apply does not mean that the defendant is not entitled to the protections upon which [the election requirement] is based," namely the protection of "the defendant's right to the unanimous verdict by the jury relative to what constitutes the offense." *Id*. The court held that

> in cases involving evidence which shows a real potential that a conviction may occur as a result of different jurors concluding that the defendant committed different acts, each of which separately showing the commission of an offense, the trial court must augment the general unanimity instruction to [e]nsure that the jury understands its duty to agree unanimously to a particular set of facts.

*Id*. at 583.

However, less than a decade later, our supreme court stated in *Adams*, "Our cases have not required that a jury unanimously agree as to facts supporting a particular element of a crime so long as the jury agrees that the appellant is guilty of the crime charged." 24 S.W.3d at 297. Then, in *Johnson*, our supreme court held that there was no need for an enhanced unanimity instruction when the evidence indicated only one offense, even though the offense was comprised of multiple discrete acts upon which the jury could base its finding. 53 S.W.3d at 635. Moreover, the *Johnson* court held that an enhanced unanimity instruction "is not required even in cases where the proof does indicate more than one offense" because "[t]he election requirement itself alleviates any unanimity concerns." *Id*. Thus, as this Court has previously noted, "we are uncertain as to the continued validity of *Brown*" in light of our supreme court's holdings in *Johnson* and *Adams*. *State v. Black*, 75 S.W.3d 422, 426 (Tenn. Crim. App. 2001). In his appellate brief, Defendant concedes that *Brown* has received negative treatment but insists that the evidence showed two distinct offenses requiring an enhanced unanimity instruction.

Throughout this case, the State has argued that the two transactions constituted the single offense of sale of .5 grams or more of cocaine within 1000 feet of a drug free zone. The jury was instructed to render a unanimous verdict. So long as the jurors agreed that Defendant sold more than .5 grams of cocaine to Mr. Higdon and that at least part of the sale occurred within the drug free zone, Defendant was afforded his right to a unanimous verdict, even if some jurors believed that only "half" of the cocaine was actually exchanged in the parking lot of Bad Habits. *Cf. Johnson*, 53 S.W.3d at 633 (holding that defendant was afforded right to unanimous verdict on single count of sexual battery even if some jurors based finding on one of two touchings). Even if the trial court should have given some kind of enhanced or modified unanimity instruction, the lack of such an instruction did not contribute to the verdict and is, therefore, harmless beyond a reasonable doubt. *See State v. Qualls*, 482 S.W.3d 1, 18 (Tenn. 2016).

*Conclusion*

Based on the foregoing, we affirm the judgment of the trial court.

_____
TIMOTHY L. EASTER, JUDGE

- 12 -